233 A.2d 423.

THE ATLANTIC REFINING COMPANY *vs.* DIRECTOR OF PUBLIC
WORKS FOR THE STATE OF RHODE ISLAND.

AUGUST 18, 1967.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kellcher, JJ.

Powers, J. This is an amended petition for the assessment of damages brought on the authority of G. L. 1956, §37-6-18. It was heard by a superior court justice sitting

without a jury and from his decision the respondent, hereinafter referred to as the state, duly prosecuted a bill of exceptions.

The parties agree that on January 19, 1962, petitioner was the owner of certain property hereinafter described, a substantial portion of which was on that date taken by the state for freeway and highway purposes, pursuant to the applicable provisions of chap. 10 of title 24 and chap. 6 of title 37 of G. L. 1956, respectively.

It is also agreed that petitioner's property comprised 257,-170 square feet or 5.9 acres located in the city of Providence, described as an irregularly shaped lot with a frontage of approximately 250′ on Elmwood avenue and approximately 249.17′ on Roger Williams avenue. The premises were otherwise identified and designated as being lot 113 on assessor's plat 88 in the land records of the city of Providence.

On the day of condemnation and for some time prior thereto, petitioner had devoted the premises to conducting the business of a petroleum bulk plant and distribution center, a detailed recital of which is not necessary to this opinion. In connection with its business, however, petitioner owned several improvements which were taken by the state, along with 152,645 square feet of the tract in question. These improvements, or structures, consist of a gasoline service station, an office building, a warehouse, a transport loading platform, an incoming transport loading platform and fuel storage tanks of varying capacities, but having a total capacity of 250,000 gallons.

Further, as mentioned above, while it would serve no useful purpose to recite in detail all of the functions, processing and general activities incidental to the use that petitioner made of the condemned property in the conduct of its business, some indication thereof is desirable in light of the award of damages assessed by the trial justice.

Briefly summarized, the property was used for five distinct purposes, which were: a furnace oil distributing terminal; a gasoline service station; storage and distribution centers for ordinary lubricating and heavy industrial equipment oils; processing oils for plastics, for dry package petroleum chemicals, packaged motor oils, greases, waxes; and as a spare part distribution center. For a period of ten years prior to condemnation, the business grossed sales of 20 million gallons of furnace oil and over 5 million pounds of packaged petroleum products annually.

It is also agreed that on the day of condemnation, and for some time prior thereto, the property was put to its highest and best use. Further, in connection with the business to which the land was devoted, it enjoyed a non-conforming use.

In any event, petitioner's experts appraised its property as having a value before the taking of not less than $831,942 and after the taking of not more than $160,675. Thus, petitioner's evidence tended to show that it had sustained damages of $671,267.

The expert testimony offered by the state was that the value of petitioner's property before the taking was $460,700 and $176,300 thereafter. This tended to support the state's contention that the damage to petitioner, resulting from the condemnation, was $284,400.

The trial justice found that the damages or fair market value to which petitioner was entitled by reason of the taking were $513,529, plus interest. From this decision the state duly prosecuted a bill of exceptions, and from those both orally argued and briefed it postures 13 issues in support of its position that justice requires remitting the case to the superior court for a new trial. In its oral argument and briefs petitioner has sought to refute the state's contentions point by point and in the main it is as thus pre-

sented and answered that we shall consider the issues raised by the state.

However, because by its very nature it lies at the threshold of the state's claim that justice requires a new trial, we shall first consider the state's contention that the trial justice committed prejudicial error in denying its motion that the case be passed.

After the taking of evidence had been concluded, petitioner filed a memorandum at the request of the court. It included the information that after the filing of the petition, the state had made an offer to petitioner of $332,778. This figure was $48,378 in excess of petitioner's damages as testified to by the state's expert. Evidence of such offer, the state argues, could not have been introduced at the trial, if objected to by it, relying on several Rhode Island cases[1] which hold that under the circumstances of those cases an offer of compromise was prejudicial.

Continuing, the state urges that the manner in which the offer of $332,778 was brought to the attention of the trial justice denied the state an opportunity to object, and being in excess of the state's expert evidence of the damages suffered by petitioner, knowledge of such offer prejudiced the state's case with the trial justice.

In denying the state's motion to pass the case, the trial justice stated in substance that his decision would be predicated on the evidence adduced by the parties, uninfluenced by reason of the state's offer. An examination of his decision on the evidence adduced at trial convinces us that it was reached without regard to or influenced by the matter complained of by the state. This circumstance, quite apart

---

[1]*Draper* v. *Horton,* 22 R. I. 592, 48 Atl. 945.

*Daniels* v. *Town of Woonsocket,* 11 R. I. 4.

*Salter* v. *Rhode Island Co.,* 27 R. I. 27, 60 Atl. 588.

*Wrynn* v. *Downey,* 27 R. I. 454, 63 Atl. 401.

*Whitlock* v. *Mungiven,* 36 R. I. 386, 90 Atl. 756.

*Laudati, Inc.* v. *Liberatore,* 51 R. I. 282, 154 Atl. 120.

from others[2] which militate against the state's complaint that it was prejudiced, warrants our conclusion that the state's position on the denial of its motion to pass the case is without merit. The cases on which it relies and referred to in footnote 1 are not in point, completely unavailing and require no discussion.

Turning to another facet of the state's appeal on its bill of exceptions, we consider two more or less related contentions on the issue of the fair market value of petitioner's property on the day of condemnation. From the outset, petitioner contended that there were no comparable sales of a bulk plant and that its evidence as to what constituted just compensation would deal with the cost of reproduction less depreciation approach. The state, however, proposed to offer a real estate expert through whom it could establish a comparable sale. The parties stipulated that the state's evidence of a comparable sale would be received subject to petitioner's objection on which the trial justice would rule before turning to a consideration of the evidence on which his decision as to fair market value would be predicated.

In an attempt to prove a fair comparable sale, the state offered as a qualified expert James E. Leary, a licensed Rhode Island real estate broker and an officer of a Massachusetts corporation which owns and leases gasoline service stations, and also owns a bulk plant. He testified to ex-

---

[2]The petitioner informs us in its brief that at a pretrial conference held with the superior court justice who tried the case, the court was informed that pursuant to G. L. 1956, §37-6-17, as amended, the state, after the amended petition had been filed, offered petitioner $332,778 so that the trial justice was in possession of this information before the trial began. Moreover, this assertion is not disputed by the state. However, the pretrial conference is not a part of the record before us and for that reason we have not rested our holding on the correctness of the trial justice's refusal to pass the case on the question of prior knowledge. If the record disclosed it, however, the state's contention as to this issue would be frivolous.

tensive experience in the setting up, maintenance and operation of gasoline stations and bulk plants while employed by the Lamson Oil Company, and similar experience acquired during wartime service with the government.

He testified in detail as to what the Lamson plant consisted of when assembled and through him pictures of the plant were introduced into evidence. This plant, he further testified, was sold in 1959 to the Richfield Oil Corporation of New York and of this sale he had personal knowledge, having participated therein. When asked what were the assets that passed in such sale, counsel for petitioner objected on the ground that the contract of sale was the best evidence.

Queried by the court as to this objection, counsel for the state replied that he would introduce the deed. Before offering it in evidence, counsel then asked the witness if in his opinion the Lamson sale was of property so similar as to be comparable. Counsel for petitioner objected for the reason that there was at that point no evidence before the court on which the witness's opinion could be based. The trial justice sustained petitioner's objection and the state made an offer of proof. It was that, if permitted to answer, the witness Leary would testify that in his opinion the properties were so similar as to qualify the Lamson sale as comparable.

Subsequently a certified copy of the deed was marked for identification. It described the land by metes and bounds but contained no mention of the improvements and the trial justice refused to admit it as a full exhibit.

More or less combining its exception on which the offer of proof is predicated and that to the refusal of the trial justice to admit the certified copy of the deed as a full exhibit, the state argues that it is reversible error for the trial justice to base his decision on evidence of reproduction cost less depreciation when there was competent evidence of a

comparable sale, citing *Hervey* v. *City of Providence,* 47 R. I. 378, 133 Atl. 618.

While we are in full accord with the principle on which the state relies, we are not persuaded that the trial justice erred in holding that there was no evidence of a comparable sale. The witness Leary offered no evidence of what the Lamson sale consisted of in 1959, and it was on the basis that no such evidence was before him that the trial justice expressly rejected the fact of the Lamson sale as constituting a sale of property so similar to that of petitioner's as to be comparable. If refusing to accept the certified copy of the deed as a full exhibit were error at all, such error was certainly not prejudicial in that the deed failed to supply the missing evidence. *Psaty & Fuhrman, Inc.* v. *Housing Authority,* 76 R. I. 87, 68 A.2d 32; *Berberian* v. *Martin,* 100 R. I. 227, 214 A.2d 189.

However, the witness Leary was also asked whether based on his long experience and qualifications as a real estate expert, he had an opinion of the fair market value of petitioner's property as of the date of condemnation. Counsel for petitioner, having consistently challenged Leary's qualifications as an expert familiar with the Rhode Island market, objected and was sustained. The state then made an offer of proof that the fair market value in the witness's opinion was $380,000.

Leary was then asked if he had an opinion of the value of property remaining to petitioner after condemnation. Again petitioner objected and was sustained, and again the state made an offer of proof. It was, that if permitted to answer, the witness would give it as his opinion that the remaining property had a fair market value of $110,000.

When the state prepared its bill of exceptions from those noted in the transcript, it was discovered that no exception appeared to have been taken to either of the two rulings on which offers of proof were made. The bill of

exceptions and transcript when presented to the trial justice were sought to be amended by the state, so as to include the exceptions which the state contended must have been inadvertently omitted by the court stenographer. The petitioner objected, and the trial justice, stating that he had an imperfect memory that the exceptions had not been taken, requested the trial stenographer to examine her notes against the possibility of an omission by inadvertence. The exceptions claimed did not appear therein and the stenographer was reasonably certain that they had not been claimed. The trial justice thereupon refused the state's request to amend the transcript.

Pursuant to the provisions of G. L. 1956, §9-24-22, the state filed in this court a motion to establish the truth of the exceptions and transcript, which motion, after oral argument, was denied without prejudice to the state to renew when the case was argued on its merits.

In so renewing its motion, the state calls our attention to the pertinent part of the transcript which discloses that throughout a long line of questions and objections immediately preceding those relating to the offers of proof, counsel for the state had duly excepted and the exceptions thereto were properly noted. It is inconceivable, the state argues, that such meticulous concern for its obligation to preserve exceptions would be neglected at so vital a juncture in the questioning of the witness Leary. Counsel for the state candidly admits that after more than two years, he has no memory of having taken the exceptions, and counsel for petitioner is equally candid. Consistency as demonstrated by the transcript, however, should persuade us, or so the state argues, that the exceptions were taken and that their absence from the transcript is the result of inadvertence on the part of the court stenographer.

While it is true that in *State* v. *Ryan*, 64 R. I. 92, 10 A.2d 451, we held that in passing on a motion to establish the

truth of exceptions and the transcript, we are not concerned with the merits of the exceptions claimed, we are also of the opinion that a transcript should not be amended under such circumstances as are here present when to do so would serve no valid purpose. The opinions that the witness Leary would have given, as established by the offers of proof, rested on his qualifications as a real estate expert. The trial justice, however, commenting on Leary's background from the witness's factual recital, rejected him as a real estate expert, stating "* * * in order to be qualified to give us his opinion in this field, I think in relation to this question you have got to give evidence that he has experience in the market, not by observations, but by participation * * *. Anybody could be a real estate expert if the rule was otherwise."

It is fundamental that the test of qualification as an expert lies in the sound discretion of the trial justice, and his determination in this regard will not be disturbed unless it can be shown to be an abuse of such discretion. *Cavallaro* v. *Sharp*, 84 R. I. 67, 121 A.2d 669; *Rossilli* v. *Iacovelli*, 88 R. I. 456, 149 A.2d 709. In the case at bar the witness Leary, although greatly experienced in the type of business conducted by petitioner, possessed very limited experience as a real estate broker, even though licensed as such. The court commented at some length in this regard and from our independent study of the witness's testimony, we conclude that his rejection as a real estate expert was not an abuse of the discretion with which the trial justice was vested.

Before considering the evidence adduced at trial bearing on the damages suffered by petitioner, the trial justice rendered a preliminary decision in which he held that the evidence offered by both parties as to functional depreciation, and received by him de bene, would not be taken into consideration, ruling that at least in the circumstances of

the instant case such evidence was incompetent. It is this preliminary decision which raises what the state presents as the third issue in the case.

Roy M. Henwood, a licensed New Jersey petroleum engineer with wide experience in his profession, and Peter A. Laudati, Jr., a Rhode Island real estate expert, testifying for the state, offered evidence of the cost of reproduction less physical depreciation, and further reduced petitioner's damages by applying a percentage loss for the various structures resulting from "functional depreciation." The thrust of their testimony was that a more modern plant would function with greater efficiency, but was not such as to enable the trial justice to make comparisons, and thus determine how and why greater efficiency would be achieved. So postured, it was purely speculative and properly rejected. Throughout its argument on this issue the state contends that the measure of petitioner's damages is the fair market value and that this in turn, whatever approach is used, is what a ready and willing buyer would pay to a ready and willing seller.

This legal fiction is more readily related to comparable sales since reason suggests that a comparable sale in the open market is strongly persuasive of the proposition that the purchase price freely agreed upon is a fair representation of the value of the similar property taken by eminent domain. Even then, however, the question of whether the property sold in the open market was so substantially similar to that condemned as to make the properties comparable, lies within the discretion of the court. See *Hervey* v. *City of Providence, supra.* Thus the willing buyer and willing purchaser theory must bear a close relationship to an established fact. If it be granted that this legal fiction can also apply where the approach used to determine fair market value is that of reproduction cost less depreciation, the established fact to which it must relate is that of the

property actually taken. Testimony tending to show that if the property were otherwise constructed, arranged or equipped, it would prove more attractive to a presumed purchaser is mere speculation without a showing that the property as constructed, arranged or equipped is less efficient for its purposes than the hypothetical property with which it is being compared.

In *Trustees of Grace & Hope Mission* v. *Providence Redevelopment Agency*, 100 R. I. 537, 217 A.2d 476, we held in effect that evidence of functional depreciation to be admissible must demonstrate that the condemned property even though out of date was not functioning efficiently for the purpose to which it was put. Here, the state's witnesses testified that modern plants used in the conduct of the business to which petitioner's property was devoted were air-conditioned, equipped with fixed foam fire protection systems, storage tanks were riveted rather than welded and that petitioner's lube oil storage and distribution system was of a "rectangular-type construction" which in recent construction is the exception rather than the rule. Just how these comparisons affected the functional efficiency of petitioner's property, however, was not made to appear. Lacking such nexus, the purported functional depreciational evidence offered by the state's witnesses was without probative force. To the same effect see *Socony-Vacuum Oil Co.* v. *French*, 88 R. I. 6, 143 A.2d 318, *Assembly of God Church* v. *Vallone*, 89 R. I. 1, 150 A.2d 11, *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400, 47 S. Ct. 144, *In re United States Comm'n to Appraise Washington Market Co. Property*, 295 Fed. 950, and *Kennebec Water District* v. *City of Waterville*, 97 Me. 185, 54 Atl. 6.

In excluding evidence of functional depreciation, the trial justice additionally noted that petitioner's business was regulated by the statutes of the state as well as ordinances of the city of Providence, and concluded that evidence

relating to theoretically less costly structures should not be received, absent a showing that such theoretical structures would conform to the regulatory statutes and ordinances as did the condemned property.

In all the circumstances it is our judgment that the trial justice's exclusion of the proffered testimony as to functional depreciation was not error.

After examining and carefully considering the remaining issues and the numerous exceptions on which they rest, we are of the opinion that such issues, save one, are so lacking in merit as to require no discussion. They are either repetitive in thrust, arise out of semantic misconceptions, rest on no exception whatsoever, or are so uncommendably addressed to the trial justice's exercise of discretion as to make a detailing of the reasons for their rejection an unwarranted extension of this opinion.

We turn to a consideration of what the parties have argued as issue number VII. Stated by respondent it is:

"The Trial Court Erred Either In:
1. Refusing To Allow The State To Cross Examine Mr. Raleigh With Respect To A Prior Appraisal Of The Subject Property, Or,
2. Allowing Atlantic To Cross Examine Mr. Laudati On A Prior Appraisal, When The Evidence Was Clear That Said Earlier Appraisal Was Based Upon Facts Not In Evidence In This Case."

At this juncture, it will be helpful to summarize the facts out of which this controversy arose.

The petitioner's real estate expert Raleigh testified in direct examination of an appraisal made by him of the subject property several days before the property was taken. In cross-examination it developed that sometime in 1960 he had been in communication with Chicago Bridge & Iron Co. and Hartwell Co. on market data relative to the value of petitioner's property. On redirect

examination he was asked by counsel for petitioner if he, Raleigh, had made a prior appraisal for petitioner, and if the inquiries made of the mentioned companies were in connection with such prior appraisal. The witness responded in the affirmative, but was unable to recall the date. Thereupon, counsel for petitioner showed the witness the cover of his first appraisal to refresh his recollection as to the exact date thereof. The witness then replied that his first appraisal was submitted to petitioner October.25, 1960.

On recross-examination, respondent sought to have the entire report of Raleigh's first appraisal marked for identification for the express purpose of cross-examining Raleigh on the contents of the report. The petitioner objected, contending in effect that there had been no testimony given by Raleigh relative to his first appraisal and that only the cover of the report had been used, and this for the sole purpose of establishing the date the first appraisal was submitted, which in turn was relevant only to explain the communications between Raleigh and the companies mentioned in cross-examinations, but not relating to Raleigh's opinion predicated on an appraisal made at the time of condemnation. In arguing its objection to the trial justice, petitioner contended that they were made at different times, the first being too remote to establish inconsistent statements and that inconsistency would be the only basis for materiality. Asked by the trial justice as to what respondent could say in rebuttal of this objection, counsel replied, "I have to agree that they are obviously different dates, Your Honor; however, I would have to say that this question would be in the nature of some preliminary inquiry. I really don't know where I am going." To this comment the trial justice observed, "That's a fishing trip," and sustained petitioner's objection.

While the general principles relating to the scope of cross-examination are well defined, it is not always a simple mat-

ter in practice to fix the line of demarcation which separates the permissible from the impermissible. It is perhaps this difficulty which has led this court as well as courts generally to say that the extent of cross-examination rests very largely within the discretion of the trial justice. *State* v. *Frazier*, 101 R. I. 156, 221 A.2d 468; *State* v. *Tutalo*, 99 R. I. 14, 205 A.2d 137; *State* v. *Campbell*, 95 R. I. 370, 187 A.2d 543; *Feuti* v. *Feuti*, 92 R. I. 219, 167 A.2d 757.

To say, however, that the question is addressed to the trial justice's discretion does not mean that his ruling on admission or exclusion is not reviewable. What it does mean is that the ruling will be sustained provided the discretion has been soundly and judicially exercised, that is, if it has been exercised "* * * in the light of reason applied to all the facts and with a view to the rights of all of the parties to the action * * *" *Colitz* v. *Gilbert*, 53 R. I. 319, 321, 166 A. 685, 686, and "not arbitrarily or willfully, but with just regard to what is right and equitable under the circumstances and the law." *Strzebinska* v. *Jary*, 58 R. I. 496, 500, 193 A. 747, 749. The question here then is whether the ruling complained of meets these standards.

We analogize the appraiser with the property owner who offers himself as a witness upon the trial of his claim for damages for a taking. He may, irrespective of whether he testified to the value of his property on direct examination, be asked on cross-examination what he paid for the property when he acquired it. *Berkley* v. *City of Jeannette*, 373 Pa. 376, 96 A. 2d 118; *Indianapolis & Cincinnati Traction Co.* v. *Shepherd*, 35 Ind. App. 601, 74 N.E. 904; *Cobb* v. *City of Boston*, 109 Mass. 438. Nichols says that this "* * * is one of the most important pieces of evidence in determining its present value * * *" and that "* * * every argument is in favor of its admissibility." 4 Nichols, Eminent Domain, sec. 12.311 [1], p. 85. Moreover, the evidence is of such importance that a refusal to allow the condemnor the right to cross-examine as to the purchase price consti-

tutes reversible error. *St. Louis & San Francisco Ry.* v. *Smith,* 42 Ark. 265; *Rea* v. *Pittsburg & Connellsville R.R.,* 229 Pa. 106, 78 A. 73; *Williams* v. *New York, P. & N. R.R.,* 153 Md. 102, 137 A. 506. The same rationale which has led to general acceptance of these principles leads further to the conclusion that an appraiser who, from the witness stand, has given an opinion of fair market value should be subject to cross-examination concerning his prior and extra-judicial expressions relative to the value of the same property. If the one falls within the scope of legitimate and relevant inquiry on cross-examination, the other must also. *Georgia Power Co.* v. *Hudson Gas Co.,* 46 Ga. App. 206, 167 S.E. 206.

The principle that permits cross-examination as to the purchase price of property or a prior expression of its value is, of course, subject to the qualification that the prior sale or appraisal was not so remote in time from the taking as to deprive it of competency. Here the intervening period was not quite 15 months, and the question is whether an October 25, 1960, appraisal is so distant in point of time from the January 19, 1962, condemnation date as to destroy its relevancy as a fair criterion of value. We need go no further than the record in this case for the answer. It discloses that the witness Raleigh premised his opinion of the fair market value of the condemned property on 1956, 1957, 1958, 1960, and 1961 sales of comparable land. If a sale of another parcel of property made in 1956 or 1957 is not too remote to be used as a comparable sale in arriving at a value to be placed upon a January, 1962 taking, then certainly an appraisal by the same expert in October, 1960 of the identical property is not too remote. Further, the trial justice in his rescript said that with respect to evidence of comparable sales, "great weight" could be given to sales entered into on 9/1/60, 11/14/60, 11/5/60, 3/13/61, and 3/21/61, and that since the date of the taking was 1/19/62, "* * * these sales were made at a time

reasonably close to the date of condemnation." The authorities are in accord and it is the general rule that a lapse of as much as five years — and in some cases longer — between the time of purchase and the date of taking, is not so extensive as in the usual case will prevent cross-examination of an owner as to what was paid for the property. *In re Real Property Borough of the Bronx,* 238 N.Y.S.2d 618, 18 A.D. 2d 991 (5 years); *North Carolina State Highway Comm'n* v. *Coggins,* 262 N.C. 25, 136 S.E.2d 265 (1½ years); *Epstein* v. *City & County of Denver,* 133 Col. 104, 293 P.2d 308 (4 years); *Dickson* v. *Davidson County,* 28 Tenn. App. 210, 188 S.W.2d 114 (3 years); *Aledo Terminal Ry.* v. *Butler,* 246 Ill. 406, 92 N.E. 909 (3 years); *United States* v. *Ham,* 187 F.2d 265 (5 years); *Lembo* v. *Town of Framingham,* 330 Mass. 461, 115 N.E. 370 (4 years).

There is, moreover, an additional, and perhaps a more compelling, reason why it was an abuse of discretion to limit the state's right to cross-examine Raleigh on his earlier statement of value. While the right to cross-examine an adversary witness exists as a means of developing the facts in a case, it has another and equally important underlying purpose and that is the opportunity it affords to test a witness as to the possibility of his bias or prejudice, and his ability to recollect. *Asgill* v. *United States,* 60 F.2d 776, 779. It is to satisfy these fundamental concepts that we have always permitted cross-examination which is designed to discredit the witness by impeaching his direct testimony through proof that he at some earlier time expressed an opinion at variance with that testified to from the witness stand. *Guglietti* v. *United Electric Rys.,* R. I., 137 A. 697. Impeachment of the credibility of a witness, we have said, is a basic purpose of cross-examination. *Bedrosian* v. *O'Keefe,* 100 R. I. 331, 215 A.2d 423; *Yeaw* v. *Williams,* 15 R. I. 20, 23 A. 33; *Russell* v. *Cavaca,* R. I., 137 A. 778.

In this case Raleigh was called as one of petitioner's chief

witnesses, and it relied heavily upon his testimony as establishing the fair market value of the condemned property. That the trial justice also relied heavily on Raleigh's testimony is readily apparent from his rescript where, referring to Raleigh and one other expert for petitioner, he states "* * * the Court places great weight on the value of their testimony because of their broad experience in the market." Once it became known that Raleigh had previously appraised the property, the cross-examiner, who obviously was unaware of what was contained in the appraisal, should have been permitted to "fish" in an attempt to obtain information which might not only reflect on the witness's prejudice, bias or credibility but might also neutralize the opinion advanced from the witness stand. "Fishing" on cross-examination, while perhaps unwise or even dangerous to the questioner in some instances, is not forbidden per se.

What was inquired into here was material, rather than collateral, to the outcome of this case. It was the ultimate factual issue in litigation. When the trial justice refused to permit the witness Raleigh to be "searched out" with respect to the contents of his prior appraisal, he denied the state the opportunity to show a possible inconsistent or contradictory expression by a key witness, not on some ancillary or incidental testimony he might have given during his extended examination, but on the very issue which required determination.

Thus the ruling prohibiting a comparison of Raleigh's separate estimates of the value of the condemned property was injudicious and unsound because it did not fully protect the rights of the state and was not made with a just regard for what was right and equitable under the circumstances and the law. If the appraisal had been marked for identification, we would now be able to ascertain whether in fact the earlier statement was so at variance with Raleigh's testimony as to impeach it and thereby reflect on his credibility.

Because the trial justice denied us that opportunity when he refused to mark the appraisal for identification, we are deprived of the opportunity of examining the excluded report for the purpose of determining whether it was in fact of such a nature as to reflect unfavorably upon that testimony of the witness Raleigh on which the trial justice relied. However, this refusal of the trial justice to permit the report to be marked for identification is the only immediate valid ground for complaint by the state.

If in fact it discloses a substantial difference between the earlier appraisal and the testimony, then clearly the erroneous exclusion would be prejudicial. If, on the other hand, the two were substantially identical, then Raleigh's testimony would not have been impeached nor his testimony neutralized.

Because of the peculiar circumstances of this case, and particularly the 36 trial days that it consumed solely for the purpose of determining just compensation, there being no issue of liability involved, we are reluctant to order a new trial pending a determination by this court as to whether the exclusion of the prior appraisal was in fact prejudicial.

We think, then, that the ends of justice will best be served by adopting the unusual procedure of directing the petitioner to supplement the record by filing in the office of the clerk of this court within twenty days of the filing of this opinion the October 25, 1960, appraisal of the witness Raleigh, and at the same time to furnish a copy thereof to the respondent. Thereafter, the parties may on October 2, 1967, having within one week prior thereto filed briefs, appear before this court and argue their respective positions on the sole issue of prejudice if any inuring in the failure of the trial justice to mark the October 25, 1960 report for identification. So proceeding, it will then be possible for this court to determine whether the case should be remitted for a new trial or the decision of the trial justice affirmed.

Motion for leave to reargue denied.

### SUPPLEMENTARY OPINION
#### OCTOBER 10, 1967.

PER CURIAM. In an opinion filed August 18, 1967, this court held that only one of the several issues raised by the defendant in its appeal from the decision of the trial justice had merit. That issue arose out of the trial justice's refusal to permit the defendant to inquire into an appraisal made by the plaintiff's real estate expert some fifteen months prior to a second appraisal on which the expert based his testimony at the trial — testimony on which the trial justice expressly relied. It was our opinion that this ruling of the trial justice constituted an abuse of discretion, but whether this in turn so prejudiced the state as to warrant returning the case for a new trial could not be determined from the record before us for the reason that the trial justice further erred in denying the defendant's request that the expert's first appraisal be marked for identification.

After our opinion had been filed as aforesaid, and in compliance with a directive set forth therein, plaintiff supplemented the record with a copy of the expert's first appraisal, thus affording this court and the state an opportunity to determine whether the two appraisals made within fifteen months of each other were at such variance as to impeach the expert's testimony.

From our examination of the originally excluded appraisal, it is established, and defendant agrees, that there are no significant discrepancies.

It follows that the rulings of the trial justice, though error, were not prejudicial and the case is therefore remitted to the superior court for entry of final judgment.

*Letts & Quinn, Andrew P. Quinn, Daniel J. Murray, Jerome B. Spunt,* for petitioner.

*Arthur N. Votolato, Jr.,* for respondent.